IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

EDWIN J. RUST,

                     *Plaintiff*,

      v.

ELECTRICAL WORKERS LOCAL NO. 26
PENSION TRUST FUND, ET AL.,

                   *Defendants*.

CIVIL ACTION NO. 3:10-CV-00029

MEMORANDUM OPINION

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

Plaintiff seeks to recover pension plan benefits governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. The matter is before the court upon the parties' cross-motions for summary judgment; additionally, Plaintiff has filed two motions to strike certain affidavits and portions of Defendants' summary judgment briefing. Upon review of the record, it is clear that, even under the most deferential review of Defendants' actions, the decision to terminate and rescind Plaintiff's pension benefits constitutes an abuse of discretion. Accordingly, I will deny Defendants' motion for summary judgment, and I will grant Plaintiff's motion for summary judgment. I will deny Plaintiff's motions to strike; although Plaintiff is correct that certain of Defendant's submissions are improperly before the court, and Plaintiff is entitled to the requested relief, I have considered the entirety of Defendants' submissions, and I find Defendants' arguments wholly unpersuasive.

## I. PLAINTIFF'S ALLEGATIONS

Edwin J. Rust, Plaintiff, alleges that Defendants – the Electrical Workers Local No. 26

Pension Plan Trust Fund (the "Electrical Workers," or the "Plan") and the Trustees of the Electrical Workers Local No. 26 Pension Trust Fund (the "Trustees")[1] – "improperly and arbitrarily terminated" his pension plan benefits and committed multiple violations of ERISA by "failing to provide him with Plan documents, despite [his] repeated requests." He sues also to recover the costs and fees incurred in filing this action against Defendants.

Plaintiff alleges that, from 1981 until 2008, he was eligible to participate in the Plan, and he retired in 2008. He states that he and his former employer consistently paid quarterly payments to the Plan from 1981 to 1992 in connection with a pension Plan benefit allegedly worth approximately $441 per month after retirement, and also consistently paid quarterly payments to the Plan from 1981 to 2008 in connection with a "Small Pension Benefit" allegedly worth approximately $95 per month after retirement plus a lump sum benefit of $9,000. Plaintiff

_____

[1] The individual Trustees are Ronald L. Bryant, Jon Eugenio (a/k/a "John Eugenio"), Michael Toman (a/k/a "Mike Towman"), Charles E. "Chuck" Graham, Jr., Michael D. Hoyt, and Ramiro G. "Butch" Ramos. At the conclusion of a hearing on March 28, 2011, United States Magistrate Judge B. Waugh Crigler granted Plaintiff leave to file a second amended complaint, identifying the Trustees in their official capacities. Defendants had opposed the motion for leave to file a second amended complaint. By order entered on March 28, 2011, "the reasons set forth on the record" at the hearing were remarked, all responses to the first amended complaint were "deemed made to the Second Amended Complaint," and Defendants were "precluded from raising the defenses of capacity or improper party." Judge Crigler's order further noted that

> [t]he Trustees, as a body, were named as defendants from the outset. The undersigned found during the hearing, *inter alia*, that defendants waived any objection to the plaintiff's Second Motion to Amend by failing to raise, in their answer to the Original and First Amended Complaints, the defenses of failure to state a claim upon which relief can be granted or failure to join the individual Trustees in their official capacities, or both, and by actively engaging in the defense of the case notwithstanding the fact they never were individually identified. Allowing the plaintiff now to identify them by their official capacities does not alter the nature of the claims, does not expose the Trustees to personal liability, does not prejudice any substantive defense, and essentially does nothing more than conform the pleadings to the evidence in the case.

I find that the Trustees are the plan administrator for the Plan as defined by ERISA. At all relevant times herein the Trustees, by and through their Appeals Committee, are, and have been, the plan administrator, the claims administrator, and the claims fiduciary, as those terms are defined under §§ 1002(16) and (21) of ERISA respectively, for the Plan.

alleges that he accrued rights to certain pension benefits under the Plan, to which he was entitled upon his retirement.  In March of 2008, Plaintiff applied for pension benefits under the Plan, the Trustees approved his application, and shortly thereafter he started receiving pension benefits.

On July 23, 2008, the Trustees notified Plaintiff that they were terminating his benefits. According to the termination letter, the Trustees based their termination decision on an allegation that Plaintiff had converted assets belonging to the Plan.

Specifically, the Trustee's representative told Plaintiff that a company, "NSR," formerly owned by Plaintiff, owed the Plan "$18,347.87 and liquidated damages and interest in the amount of $3,669.57."  According to the termination letter, the Trustees determined that Plaintiff had "converted assets belonging to [the Plan] that were previously in the possession of" NSR. Therefore, according to the Trustees, Plaintiff had "constructively received any Pension Benefit due to [him] based upon [his alleged] 10.25 years of Pension credit."   The Trustees further demanded that Plaintiff repay the Plan $3,528.00 in Plan benefits that he had allegedly already been paid.

The termination letter does not cite a single provision of the Plan documents upon which the Trustees relied when determining that Plaintiff had "converted assets" or upon which the Trustees relied when ultimately terminating Plaintiff's benefits.  The termination letter does not cite any provision of the Plan documents or any statutory or regulatory ERISA provision upon which the Trustees relied when determining that the Plan was legally or equitably entitled or authorized to recover or set-off any past or present Plan benefit payments to Plaintiff.  Nor does the termination letter state any factual information upon which the Trustees relied when determining that Plaintiff had "converted assets" and terminating Plaintiff's benefits.

On July 27, 2008, Plaintiff requested that the Trustees provide all plan documents

applicable to his rights to benefits under the Plaint, and requested any documentation relied upon by the Trustees when making the determination decision. Plaintiff alleges that, in response, the Trustees' representative refused to provide Plaintiff with any Plan documents; alternatively, Plaintiff alleges that the Trustees failed to provide any Plan documents.

Plaintiff timely appealed the Trustees' decision to terminate this benefits, asserting that the decision to terminate benefits was inaccurate, arbitrary and capricious, an abuse of discretion, and not based on any factual evidence. In the first appeal, counsel for Plaintiff explained that Plaintiff had not converted any assets belonging to the Plan, and that, in fact, NSR, the company referred to in the termination letter, had defaulted on its loan obligations and was seized by CommerceFirst Bank (the "Bank") in 2004 (approximately four years before the termination of benefits)). At that same time in 2004, the Bank took control of NSR's assets, subsequent to which Plaintiff had no control over NSR's capital or other assets. Plaintiff's counsel provided documents indicating that the Bank had excluded Plaintiff from exercising any control over NSR after the seizure.

The Trustees' representative acknowledged receipt of the appeal on December 29, 2008, and denied the appeal on March 12, 2009, stating that "Rust's pension benefit has not been denied outright; rather, it has been found that Mr. Rust has already constructively received any pension benefit due to him based upon his 10.25 years of pension credit. In fact, Mr. Rust has been overpaid in error in the amount of $3,528.00." The letter of March 12, 2009, requested that Plaintiff submit more documentary evidence that he had not converted the Plan's alleged assets at issue (essentially asking Plaintiff to prove a negative). The letter does not cite any provisions of the Plan documents or statutory or regulatory ERISA provisions upon which the Trustees' relied in denying benefits and the appeal, nor does it state any factual information upon which

the Trustees' decision was based.    Instead of concluding the administrative appeal process, the Trustees initiated a second, supplemental appeal period, pursuant to which Plaintiff lodged his second appeal.  In the second appeal letter, Plaintiff's counsel also made a claim for the Small Pension Benefit, entitling Plaintiff to a monthly payment of $95 plus a lump sum benefit of $9,000.  Counsel asserted to the Trustees that any termination of benefit based on a common law theory of setoff or offset of Plaintiff allegedly having "constructively" received Plan benefits due to him was not based on any statutory or contractual rights, and that termination of the benefits was contrary to the facts and the applicable law.  Counsel explained that Plaintiff's claim for Plan benefits is governed by ERISA and the terms of the Plan documents, not common law, and that, furthermore, the decision to terminate benefits was contrary to common law, as there was no mutuality between the two alleged claims, given that the claim for benefits was based on pension payments that, as a matter of undisputed fact, Plaintiff and his former employer made to the Plan from 1981 to 2008, whereas the claim against NSR is based upon NSR's alleged failure to make payments to the Plan.

On September 3, 2009, Plaintiff's counsel requested from the Trustees, pursuant to ERISA, "all plans, policies, or contract documents of the Fund or the National Electrical Benefit Fund relating to Mr. Rust and any and all documents relied upon by the Fund in reaching its erroneous and unreasonable decision (i.e., the administrative record)," but the request was not fulfilled.

On November 5, 2009, having received no Plan documents from the Trustees, counsel contacted the Trustees' representative and repeated the request, stating that "the Fund has failed to provide the requested plan documents, policies, and contracts and administrative record compiled and relied upon by the plan/claims administrator in this matter.  As stated in my

September 3, 2009 letter, the document request was made pursuant to ERISA.  Produce the documents to my office immediately."  The request was not fulfilled.

On December 15, 2009, the Trustees upheld their earlier termination of Plaintiff's Plan benefits and denied his second appeal, stating, once again, that "Rust's pension benefit has not been denied outright; rather, it has been found that Mr. Rust has already constructively received any pension benefit due to him based upon his 10.25 years of pension credit.  In fact, Mr. Rust has been overpaid in error in the amount of $3,528.00."  Like the Trustees' earlier letters, the letter of December 15, 2009, does not cite any provision of the Plan documents, any statutory or regulatory ERISA provision, or factual information upon which the Trustees' decision was based.  Nor does the letter of December 15, 2009, address any of the points raised by Plaintiff's counsel during the second appeal.  Plaintiff states that,

> [u]pon information and belief, and based on the Trustees' refusal to produce the Plan documents pursuant to ERISA and the Trustees' refusal to consider the applicable law and documents in making their decision, the Trustees' termination of Rust's Plan benefits is based on some personal animosity that the Trustees have toward Rust, rather than any factual information, ERISA provisions, or Plan documents.

According to the letter of December 15, 2009, Plaintiff has exhausted his administrative remedies.  Although the letter failed to respond to Plaintiff's request for Plan documents, the Trustees did enclose a document that appears to be a summary plan description ("SPD") for a health and welfare benefit plan, but was not a pension Plan SPD, which is the Plan at issue in this matter.  The health plan SPD produced by the Trustees relates to the "Electrical Welfare Trust Fund," not the Pension Trust Fund at issue in this matter, and it contains no information regarding the pension benefits at issue in this matter.  Furthermore, Plaintiff alleges the copy of the Health SPD produced by the Trustees on December 15, 2009, is incomplete, given that the

table of contents for the Health SPD states that the document is at least 76 pages long, but the copy of the Health SPD produced by the Trustees is only 69 pages; according to the table of contents, the sections missing (the sections after page 69) from the Health SPD produced by the Trustees are entitled "Your ERISA Rights" and "Plan Information."

On February 10, 2010, Plaintiff's counsel again requested Plan documents and other documents from the Trustees, stating the following:

> To be clear, Mr. Rust is requesting for the fourth time any and all Pension Plan documents relating to the Pension Plan benefits at issue and the Pension Plan Administrator's erroneous decision to terminate those benefits. This request -- like the three previous document requests -- includes, but is not necessarily limited to, the following: (i) the current complete Plan document for the IBEW Local No. 26 Pension Trust Fund; (ii) all versions of Plan document for the IBEW Local No. 26 Pension Trust Fund, if any, from 1981 to the present; (iii) the current summary plan description for the IBEW Local No. 26 Pension Trust Fund; (iv) all versions of the summary plan description for the IBEW Local No. 26 Pension Trust Fund, if any, from 1981 to the present; (v) the annual report; (vi) the bargaining agreements, trust agreements, contracts, or any other instruments under which the IBEW Local No. 26 Pension Trust Fund was established or is operated; and (vii) the complete administrative record related to Mr. Rust and his claim for Pension Plan benefits, including all paperwork related to his Pension Plan benefits and the Plan Administrator's decision to terminate those benefits. This request for Pension Plan documents is made pursuant to 12 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2575.502c-1 of ERISA.
>
> If there are no Pension Plan documents please state so. If the Plan Administrator's decision is not based upon any documents, and, therefore, there is no administrative record, please state so. If I do not hear from you within 30 days of receipt of this certified letter I will assume there are no such documents and will act accordingly.

The Trustees did not respond within 30 days of receiving Plaintiff's request of February 10, 2010.

On or about May 11, 2010, counsel for Defendants produced an October 1, 2004, copy of the "Electric Workers Local No. 26 Pension Plan" to Plaintiff's counsel. Plaintiff states his "information and belief" that this document is actually a copy of the Plan's SPD, and that "there

is no current Plan document other than the document produced by the Trustees to Rust on May 11, 2010."

On or about September 7, 2010, counsel for Defendants finally produced to Plaintiff's counsel a copy of what Defendants purport to be the administrative record in this matter. Plaintiff contends that, upon review of the documents, the administrative record is incomplete according to the regulatory definition at 29 C.F.R. §§ 2560.503-1(m)(8)(i)-(iv), and therefore Defendants have yet to produce a complete copy of the administrative record, despite receiving several requests from Plaintiff and Plaintiff's counsel.   Specifically, Plaintiff alleges that "Defendants have not yet produced to Rust a copy of the Plan document," or, in the alternative , that "Defendants have not yet produced to Rust a copy of the Plan's SPD."   Plaintiff adds that "Defendants have not yet produced . . . all versions of the Plan document for the IBEW Local No. 26 Pension Trust Fund, if any, from 1981 to the present," "all versions of the summary plan description for the IBEW Local No. 26 Pension Trust Fund, if any, from 1981 to the present," "the annual report or any summary annual report ('SAR') for the Plan," nor "the bargaining agreements, trust agreements, contracts, or any other instruments under which the IBEW Local No. 26 Pension Trust Fund was established or is operated."

Count I, alleging a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3), states that ERISA imposes fiduciary duties upon Defendants to disseminate and produce correct information and certain documents upon request of participants, and that, by repeatedly failing to provide Plaintiff with the requested Plan documents during and after the administrative appeal process, Defendants breached their fiduciary duties.   Because of the failure to provide the Plan documents, Plaintiff has been caused, and is being caused, substantial financial harm. Additionally, he has been placed in a situation where he has had to appeal the Trustees'

-8-

termination of Plan benefits without knowing his full rights under the Plan documents.  Plaintiff contends that, as a result of the Trustees' failure to provide the Plan documents in violation of ERISA, the court should order that Defendants are estopped from terminating his Plan benefits, and Defendants must reinstate Plaintiff's pension benefits in full and reimburse him for any benefits owed to him since the date of termination.

Count II alleges failure to provide Plan documents under 29 U.S.C. § § 1132(a)(1)(A) and (c)(1).  Plaintiff contends that each failure by the Trustees to provide him with the Plan documents within 30 days of the request constitutes a separate violation of ERISA, entitling Plaintiff to recover up to $110 per day in statutory damages.  In Plaintiff's view, Defendants' failure to comply with the multiple requests for materials has not been inconsequential or otherwise "innocent."  To the contrary, Plaintiff asserts, the Trustees' failure has caused and continues to cause Plaintiff and his counsel to suffer significant prejudice in the following ways: (i) in preparing and submitting Plaintiff's appeal of the Trustees' termination of benefits; (ii) in assessing the merits (or lack thereof) of the Trustees' position as to Plaintiff's pension benefits; and (iii) in preparing for this lawsuit.  Plaintiff asserts that, because the Trustees have failed to comply with ERISA's requirements in failing to provide certain Plan documents and materials to Plaintiff, because the Trustees are a sophisticated party which should be fully aware of the requirements of ERISA, and because Plaintiff has suffered significant prejudice as a result of the Trustees' refusal to provide the requested materials, the court should award the full $110 per day penalty against Defendants for each and every failure to provide the requested materials.

Count III seeks, pursuant to 29 U.S.C. § 1132(a)(1)(B), the court's enforcement and clarification of Plaintiff's right to benefits.  Pursuant to the Plan document produced by the Trustees and the applicable law of ERISA, the Trustees do not have discretionary authority to

approve, deny, or terminate claims for Plan benefits, including Plaintiff's claim for Plan benefits. Plaintiff requests that the Trustees' decision to terminate his pension Plan benefits be overturned "because the decision is wrong, incorrect, improper, unlawful, not based on any evidence, contrary to the plain language of the Plan, an abuse of discretion, and/or arbitrary and capricious." Plaintiff seeks the award of benefits retroactively to July 2008 (the date of termination), and going forward on a monthly basis pursuant to the Plan documents. Plaintiff also seeks attorneys' fees and all other appropriate relief under ERISA for having to litigate these issues in this lawsuit.

## II. THE SUMMARY JUDGMENT RECORD[2]

My comparison of the factual allegations in the complaint with the facts disclosed in the record before the court reveals very little difference between the two.

The Plan is named the "Electrical Workers Local No. 26 Pension Plan." Administrative Record ("A.R.") 119, 124. The record includes an apparent copy of a 2004 summary plan description ("2004 SPD"). A.R. 119-202.

The Plan is a multi-employer plan that provides, among other things, pension benefits to former employees that are or were "Active Participants." A.R. 125-26, 127. Pursuant to the Plan, an employee-participant's pension benefits become "vested" based on, among other things, the amount of time "an Employee is paid, or entitled to payment for the performance of duties in Covered Employment or Contiguous Non-Covered Employment for an Employer during the

---

[2] Defendants filed a copy of an alleged administrative record with the court on September 29, 2010, after producing it to Plaintiff's counsel on May 11, 2010. As discussed elsewhere in this opinion, Plaintiff disputes that the administrative record produced by Defendants is complete, as required by ERISA.

applicable computation period."  A.R. 128-29.  Employee pension benefits vest in yearly and quarter-yearly increments based on the participant's years of participation in the Plan.  A.R. 133. According to the Plan's Web-site, "[v]esting means you have worked for 5 years with a minimum of 1600 hours each year.  You will be entitled to a Pension once you have reached that status.  *Your right to that Pension cannot be forfeited*."[3]  (Emphasis added).  Under the Plan, pension benefit payments "shall commence as of the first day of the month following the month in which the Trustees approve the written application for benefits submitted by an Employee." A.R. 161.

For benefit claims filed on or after January 1, 2002, the Plan incorporates the claim and appeal procedures outlined in the Department of Labor's ("DOL") Rules and Regulations for Administration and Enforcement, Claims Procedure, Final Rule.  A.R. 174.  The DOL's Final Rule is located at 29 C.F.R. § 2560.503-1.  Subsections of significance in this case include subsection (g)1(i)-(iv) (information to be included in adverse benefit determinations); subsection (j)(1)-(4) (information to be included in adverse determinations on appeal); and subsection (h)(2) (requiring production of information and documents relevant to a benefit claim).

The DOL regulations further require the Electrical Workers to establish and maintain a procedure by which claimants can have a reasonable opportunity to appeal adverse determinations to the plan administrator, *i.e.*, the Trustees,[4] and under which the Trustees will

---

[3] Local 26 IBEW-NECA Joint Trust Funds, Pension Benefits FAQ's ("FAQ Web-site"), http://www.ewtf.org/index.cfm?pageId=94#vesting. Plaintiff's motion for summary judgment cites the FAQ Web-site and states that it was "last visited Jan. 25, 2011"; the court last verified the content on September 14, 2011.  As Plaintiff notes, "the website does not include copies of any Plan documents."  Indeed, as of September 14, 2011, the Local 26 IBEW-NECA Joint Trust Funds Web-site's links to "Overview of Benefits" and "Summary Plan Description" were blank, *i.e.*, devoid of content.

[4] As previously noted, the Trustees are the plan administrator for the Plan as defined by ERISA, and (continued...)

provide a "full and fair review of the claim" and the adverse benefit determination.  *Id*. §
2560.503-1(h)(1).  If the Trustees fail to establish or follow claims and appeal procedures, a
claimant "shall be deemed to have exhausted the administrative remedies available under the
plan and shall be entitled to pursue any available remedies under [29 U.S.C. § 1132(a)] on the
basis that the plan has failed to provide a reasonable claims procedure that would yield a
decision on the merits of the claim."  *Id*. § 2560.503-1(l).

From 1981 to 1992, Plaintiff was an active participant in the Plan and accumulated "10.25
years of pension credit."  A.R. 89-90, 91.  Plaintiff earned this pension credit by virtue of his
status as an "Employee" under the Plan for various employers.  A.R. 89-90, 91, 128-29.  During
his time as an employee, Plaintiff's former employers made payments to the Plan on behalf of
Plaintiff for his pension benefits.[5]  A.R. 127.

In 1993, Plaintiff established NSR.  A.R. 46, 117, 118.  Plaintiff was the president of NSR.
A.R. 117-18.  NSR was an "Employer," as defined by the Plan.  A.R. 117.  In September 2004,
NSR defaulted on its loan obligations with CommerceFirst Bank (the "Bank"), and the Bank
took over the business of NSR.[6]  A.R. 46.

_____

[4](...continued)
at all relevant times herein the Trustees, by and through their Appeals Committee, are, and have been, the
plan administrator, the claims administrator, and the claims fiduciary, as those terms are defined under §§
1002(16) and (21) of ERISA respectively, for the Plan.  *See* n. 1, *supra*.

[5] The Electrical Workers calculate Plaintiff's monthly pension benefit payment based on his 10.25
years of pension credit to be $441.00 per month.  A.R. 73, 91.  According to the Electrical Workers, the value,
as of October 1, 2008) of Plaintiff's full pension benefit was at least $49,191.  A.R. 73.  Plaintiff does not
accept or agree with that calculation, but contends that, "even if the calculation was correct, it proves that the
Electrical Workers' decision to terminate was unreasonable."  And, although there appears to be no authority
in the Plan for the Electrical Workers to use mathematical assumptions contrary to those in the Plan, the
Electrical Workers stated that the October 1, 2008, value of $49,191 was based on "assumptions [that] are
different from the assumptions set forth in section 7.4 of the plan."  A.R. 75.

[6] Apparently, upon NSR's default in September 2004 the Bank took complete control over NSR's
(continued...)

In early 2008, Plaintiff applied for pension benefits under the Plan.  *See* Amended Complaint ("Am. Compl.") ¶ 14; Answer ¶ 14.  On April 8, 2008, the Plan's Fund Manager, Peter Klein, wrote a letter to Plaintiff regarding some questions about Plaintiff's benefit claim.[7] A.R. 92.  On April 18, 2008, Plaintiff responded to Klein's questions and provided the requested information.  A.R. 92.  Shortly thereafter, the Electrical Workers approved[8] Plaintiff's benefit claim and made a lump sum payment to him (for past due benefit payments) and started paying him $441 per month.  *See* A.R. 89-90 (stating that Plaintiff had been paid $3,528 in pension benefits).

On May 30, 2008, an unidentified individual drafted a document (bearing the Electrical Workers' letterhead) entitled "Appeal to the Members of the Board of Trustees June 18, 2008" (the "Appeal Document").  A.R. 91.  The Appeal Document describes its subject as "Consideration of Suspension of Pension Benefits for Former Delinquent Employer."  *Id.*  It

---

[6](...continued)

assets and Plaintiff had no involvement in or control over NSR's capital or assets.  A.R. 46-56.  Plaintiff asserts that "[t]he Bank's refusal to include [him] in these matters" resulted in NSR "failing to realize thousands of dollars of collateral owed to it and contributed to the demise of NSR."  A.R. 46.  Eventually, Plaintiff filed suit against the Bank asserting, *inter alia*, that the Bank had failed to use commercially reasonable efforts to realize the full amount of NSR's collateral.  A.R. 48-56.

[7] The Electrical Workers did not include Klein's April 8, 2008, letter to Plaintiff in the administrative record.  However, Plaintiff's letter of April 18, 2008, to Klein, states that it is in response to Klein's "letter dated April 8."  A.R. 92.

[8] In their Answer, the Electrical Workers deny that they "approved" Plaintiff's benefit claim.  *See* Am. Compl. ¶ 15; Answer ¶ 15.  And, the administrative record submitted to the court by the Electrical Workers does not include any approval letter to Plaintiff, nor any payment receipts or account information for payments the Electrical Workers made to Plaintiff in response to his benefit claim.  However, the Electrical Workers admit that they responded to Plaintiff's benefit claim by paying a lump sum of $3,528.00.  Answer ¶ 15.  Furthermore, documents in the administrative record show that the Electrical Workers made payments to Plaintiff for his benefit claim, *see, e.g.*, A.R. 89-90, and that such payments would have been made only after the Trustees approved his benefit claim, *see* A.R. 161.  Thus, the Electrical Workers claim that they did not approve Plaintiff's benefit claim, despite the obvious fact of having made benefit payments to him.  In any event, there is no genuine dispute that the Electrical Workers initially approved Plaintiff's benefit claim before terminating his benefits on July 23, 2008.

confirms that Plaintiff retired "with a benefit of $441.00 per month based on 10.25 years of pension credit" and states that, after Plaintiff stopped "covered employment," he "subsequently became an 'owner' and was precluded from participating in the Plan." *Id*. The Appeal Document states that NSR became delinquent on payments to the Plan, including "18,347.87 in pension contributions" NSR allegedly owed the Plan and $3,669.57 in "pension liquidated damages and interest." *Id*. Based on the debt allegedly owed to the Plan – not by Plaintiff, but rather by NSR – the Appeal Document asks the Electrical Workers' counsel to consider the effect of "suspending" Plaintiff's pension benefits "in light of his negligence and violation of the collective bargaining agreement."[9] *Id*.

Thus, according to the Appeal Document, the Trustees were asked (by an unknown or unnamed individual or entity) whether the Trustees would "suspend the Participant's pension benefits based on his status as a former Employer" – although NSR, not Plaintiff, was the "employer" – "who is delinquent in making contributions to the Plan." *Id*.

Based on the date of June 18, 2008, specified in the Appeal Document, one assumes the matter was considered by the Trustees on that date. *Id*. It appears that the Trustees had the

---

[9] This collective bargaining agreement, upon which Defendants claim to have relied in terminating Plaintiff's benefits, is not included in the administrative record. And, although the June 2008 Document quoted above states that "Counsel's opinion is attached," the opinion is not included as part of the administrative record. Additionally, the administrative record includes Electrical Workers' "Memo to File Dated May 22, 2009" (the "Memo to File"); the Memo to File, which is actually dated September 7, 2010 (and which Plaintiff claims is "back-dated"), asserts that "[t]here exists a Memorandum to the File dated May 22, 2009 which we believe is part of the administrative record. This document  is protected by the attorney-client privilege and the work product doctrine." A.R. 22.

Communications directly related to Plaintiff's ERISA claim fall under the fiduciary exception to the attorney-client privilege and are not protected from discovery. The Electrical Workers are fiduciaries acting on behalf of Plaintiff and other plan participants. Therefore, the Electrical Workers and their attorneys owe a fiduciary and statutory obligation to provide Plaintiff with the communications at issue. *See, e.g., Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992); *Coffman v. Metropolitan Life Ins. Co..*, 204 F.R.D. 296 (S.D. W. Va. 2001). They have failed or refused to do so.

In any event, I must consider the administrative record Defendants have submitted, and Defendants must defend their decisions based on the administrative record they have submitted.

following information before them when they took the matter under consideration:

- A calculation or accounting of Plaintiff's pension benefit of "$441.00 per month based on 10.25 years of pension credit."[10]

- A calculation or accounting of an amount allegedly owed by NSR to the Plan.[11]

- A calculation of pension benefits already paid to Plaintiff by the Plan.[12]

- A collective bargaining agreement.[13]

- The opinion of counsel.[14]

- The 2004 SPD.[15]

A.R. 91.

On July 23, 2008, the Electrical Workers' representative[16] wrote to Plaintiff, informing Plaintiff of the Trustees' decision to terminate Plaintiff's pension benefits. A.R. 89-90. The letter adds that NSR (not Plaintiff) owes the Plan "$18,347.87 and liquidated damages and interest in the amount of $3,669.57." A.R. 89. Furthermore, the letter stated that the Trustees

---

[10] The administrative record includes no documentation of any calculation or accounting used to arrive at this pension benefit.

[11] Documentation to support this accounting or calculation does not appear in the administrative record.

[12] Documentation to support this calculation does not appear in the administrative record.

[13] Relied on by the Electrical Workers, but not included in the administrative record or produced to Plaintiff.

[14] Not included in the administrative record.

[15] Not included in the administrative record.

[16] That representative was Eric J. Wexler, of the law firm McChesney & Dale, P.C.; Mr. Wexler and McChesney & Dale appear as counsel for Defendants in this action. Mr Wexler has been admitted in this matter *pro hac vice*, but he is not a member of the bar of this court. Defendants' motion for summary judgment and various other filings are not signed by a member of the bar of this court, nor have they been served upon local counsel for Defendants. *See* W.D. Va. Local Rule 6.

had determined that Plaintiff had "converted assets belonging to the Pension Trust Fund that were previously in the possession of NSR Electrical, Inc. to [Plaintiff] individually for [his] own personal use," and, "[a]s such, [Plaintiff had] constructively received any Pension Benefit due to [him] based upon [his] 10.25 years of Pension credit." *Id*. Therefore, the Electrical Workers determined that Plaintiff had already received his pension benefit and would receive "no further monthly benefit." *Id*. Additionally, the Electrical Workers demanded that Plaintiff return $3,528 in benefits already sent to him. *Id*.

Plaintiff timely appealed the Electrical Workers' decision to terminate his pension benefits. Am. Compl. ¶ 27; Answer ¶ 27. On December 18, 2008, counsel for Plaintiff wrote to the Electrical Workers' representative, stating that Plaintiff could not have converted any assets of NSR due to the Bank's seizure and exclusive control of NSR and its assets.[17] A.R. 60-61. On February 3, 2009, counsel for Plaintiff forwarded a letter from Plaintiff stating that Plaintiff had not converted any assets of NSR and, in fact, had "lost essentially all of [his] assets as a result of the collapse of NSR." A.R. 40-41. Furthermore, Plaintiff reiterated that he could not have taken any assets belonging to NSR since the Bank refused to allow him to have any access to or control over those assets. A.R. 41.

On March 12, 2009, the Electrical Workers' representative sent a letter to Plaintiff's counsel, stating that the Electrical Workers had denied Plaintiff's appeal. A.R. 27-29. The letter stated that Plaintiff's pension benefit had "not been denied outright; rather, it has been found that [Plaintiff] has already constructively received any pension benefit due to him based upon his

---

[17] Plaintiff's counsel enclosed with the December 2008 letter copies of a complaint Plaintiff had filed on September 5, 2007, against the Bank in the Circuit Court for Nelson County, Virginia, and a May 2006 letter from Plaintiff to the Bank regarding Plaintiff's lack of possession of NSR's assets and financial information. A.R. 48-59. Regarding the lawsuit, the record suggests that it "was ultimately settled after the Court ruled in [Plaintiff's] favor on some preliminary motions." A.R. 61.

-16-

10.25 years of pension credit" and that Plaintiff had been "overpaid" in the amount of $3,528. A.R. 27.  The Electrical Workers stated that Plaintiff had not provided any "documentary support" showing that the Bank had excluded him from controlling or recovering NSR's assets. A.R. 28.  The Electrical Workers further asserted that, because Plaintiff's lawsuit against the Bank "was ultimately settled and dismissed," Plaintiff had "either . . . received recovery from the Bank or . . . settled away NSR's right of recovery against the Bank, thus depriving NSR's creditors from recovery, or both."  *Id*.  The letter does not state any factual or legal basis for the Electrical Workers' conclusion that Plaintiff had "received recovery" from the Bank, or any actions by Plaintiff that had deprived the Electrical Workers of their claims against NSR.[18]

On April 7, 2009, Plaintiff's counsel provided to the Electrical Workers' counsel a copy of the Settlement Agreement regarding the suit by Plaintiff and his wife against the Bank.  A.R. 30. The Settlement Agreement is a confidential document, and was provided to the Electrical Workers' counsel under the express caveat that "the settlement agreement is for 'attorney's eyes only' and should not be shared with your client."  *Id*.  Nonetheless, the Settlement Agreement was shared with the client:  the Electrical Workers have included the Settlement Agreement in the administrative record, *see* A.R. 31-38, implying that the Electrical Workers based their decisions on the Settlement Agreement, although they should not have considered (or even have seen) the document during the administrative appeal process, *see* A.R. 30.  Moreover, the

---

[18] Based on the documents in the administrative record, the Electrical Workers had only the following evidence at the time of their March 12, 2009, denial decision:  (1) the 2004 SPD (although the Electrical Workers did not referred to or rely on the 2004 SPD in terminating Plaintiff's benefits, and the Electrical Workers did not include any documents supporting their decision in the administrative record); (2) Plaintiff's appeal letters (A.R. 40-41, 60-61); (3) Plaintiff's complaint against the Bank (A.R. 48-58); and (4) Plaintiff's May 2006 letter to the Bank (A.R. 59).  Significantly, none of these documents suggests that Plaintiff converted any assets of NSR, and there are no other documents in the administrative record that the Electrical Workers could have relied on in making their decision of March 12, 2009.

Settlement Agreement was signed on June 23, 2008, *see* A.R. 32, almost a full month after the May 30, 2008, "Appeal to the Members of the Board of Trustees June 18, 2008," and five days after the Trustees' meeting on June 18, 2008, at which they apparently decided to terminate Plaintiff's benefits, *see* A.R. 91, and the Electrical Workers' counsel did not receive a copy of the Settlement Agreement until April 7, 2009, after the Electrical Workers terminated Plaintiff's benefits and denied his first appeal.  Thus, despite its inclusion in the administrative record, any information disclosed by the Settlement Agreement could not have formed the basis for the Electrical Workers' decisions regarding Plaintiff's benefits.   In any event, the Settlement Agreement contradicts the unsupported assertion that Plaintiff had "either . . . received recovery from the Bank or . . . settled away NSR's right of recovery against the Bank, thus depriving NSR's creditors from recovery, or both," *see* A.R. 28, given that, as part of the settlement, Plaintiff agreed to pay the Bank $75,000 and to assign a $600,000 life insurance policy to the Bank, *see* A.R. 34.

On May 13, 2009, counsel for Plaintiff sent an e-mail to the Electrical Workers' counsel asking to be informed of the "basis or authority" supporting the Electrical Workers' decision. A.R. 19.  Plaintiff's counsel asked, "Does the Pension Trust Fund Plan authorize the Union to stop payment based on its asserted theory?"   *Id*.   On July 22, 2009, the Electrical Workers' counsel responded, stating that he did not understand "what exactly [Plaintiff was] looking for," and, without citing any authority or any provisions in the Plan documents, provided the following response:

> A rough analogy to this would be if the Olive Garden sued me for the price of my meal, but I had already paid for the meal.  I would not say, in my defense, that the amount due to Olive Garden for my meal should be "offset" by the amount of money that I had already paid; rather I would just say that I already paid.

A.R. 18.  In sum, the Electrical Workers' representative did not claim that the Electrical Workers had relied on any provision of the Plan, or any section of ERISA or its attendant regulations, when they denied Plaintiff's pension benefits.

Pursuant to the Electrical Workers' letter of March 12, 2009, Plaintiff timely lodged a second appeal of the decision to deny benefits to him.  Am. Compl. ¶ 41; Answer ¶ 41.  In a letter dated September 3, 2009, counsel for Plaintiff explained that Plaintiff's benefits and his benefit claim are governed by the Plan's documents and policies and federal law, not common law.  A.R. 16-17.  Counsel further explained that, even under common law, the Electrical Workers' theory that Plaintiff "constructively received" benefits was erroneous, because it was based on debts allegedly owed by NSR (not Plaintiff) to the Plan.  A.R. 16.  Plaintiff's benefit claim, on the other hand, was based on payments made to the Plan by Plaintiff's former employers.  A.R. 17.  Thus, Plaintiff's benefits were not only completely unrelated to NSR's alleged debts, but were vested and not subject to forfeiture, and the Electrical Workers' legal theory, which was not based on any provisions in the Plan or ERISA statutes or regulations, failed for lack of mutuality.  A.R. 17.

On December 15, 2009, the Electrical Workers' counsel wrote to Plaintiff's counsel, stating that the Electrical Workers had determined to deny Plaintiff's second appeal.  A.R. 9-11.  For the most part, the letter of December 15, 2009, relates to a potential claim by Plaintiff for employee welfare benefits (health benefits, not pension benefits) and has no bearing on Plaintiff's pension benefit claim.  A.R. 9-10.  Regarding Plaintiff's second appeal for pension benefits, the Electrical Workers summarily state that "the evidence submitted to date is not sufficient to warrant overturning the determination that [Plaintiff] has already constructively received his pension benefits."  A.R. 10.  The Electrical Workers continued to maintain that

Plaintiff had been "overpaid" or had "constructively received" all his benefits.  A.R. 11.

The Electrical Workers also stated that Plaintiff had exhausted his administrative remedies under the Plan.  A.R. 11.

The record discloses that, throughout the administrative claim and appeal process, Plaintiff and his counsel repeatedly requested Plan documents and information from the Electrical Workers.  Answer ¶¶ 101, 106, 111 (the Electrical Workers admissions that Plaintiff "requested Plan documents from the Trustees").  Prior to retaining counsel, Plaintiff responded to the Electrical Workers' termination letter of July 23, 2008, with a letter of his own, dated July 27, 2008, a copy of which Plaintiff has submitted as a document in support of his motion for summary judgment.  Plaintiff's Motion for Summary Judgment, Exhibit B (docket no. 39, attachment 3).  Plaintiff drafted and mailed the letter to the Electrical Workers' representatives,[19] requesting the "original paperwork that I signed in 1981 and the paperwork for NSR Electrical, Inc. which was executed in 1992-3" and to be informed of "the basis for your denial of my pension from the above reference[d] documentation."  Docket no. 39, attachment 3.

Plaintiff's counsel sent three letters to the Electrical Workers, each including several requests for documents, on September 3, 2009, November 5, 2009, and February 10, 2010.  A.R. 15, 13, & 9-11).  The letters are in the administrative record compiled by the Trustees.  In their Answer, the Electrical Workers admit that Plaintiff made all three of these requests to the Trustees.  Am. Compl. ¶¶ 101, 106, 111; Answer ¶¶ 101, 106, 111.

On May 11, 2010, the Electrical Workers produced a copy of the aforementioned 2004 SPD.  A.R. 1, 119-202.  The complaint alleges that "there is no current Plan document other than

---

[19] Mr. Wexler, *see* n. 16, *supra*; and Mr. Klein, the Plan's Fund Manager, *see* n. 7, *supra*, and thereby annotated text.

the document produced by the Trustees to [Plaintiff] on May 11, 2010," *see* Am. Compl. ¶ 77; however, the Electrical Workers deny this in their answer, *see* Answer ¶ 77.   And, although the Electrical Workers have produced a copy of the administrative record, it does not include the following:  (1) any Plan document other than the 2004 SPD; (2) the Annual Report for the Plan; (3) the Collective Bargaining Agreement; (4) the Trust Agreement; or (5) any Plan contracts.[20]

### III. Discussion

#### A.

#### 1.

The 2004 SPD states that the Trustees have the authority "to construe the terms, provisions, and rules of the Plan."  A.R. 179.  A decision made by the trustees of an ERISA benefit plan is ordinarily reviewed *de novo*.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   However, where a plan gives the trustees discretion to determine benefit eligibility or to construe plan terms, the decision is reviewed for abuse of discretion.  *Id*. at 111. A decision to terminate or deny benefits under an ERISA plan is reasonable, and therefore not an abuse of discretion, "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  *Bernstein v. Capital Care, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995).

In *Booth v. Wal–Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th

---

[20] Plaintiff asserts, and Plaintiff's counsel declares, (1) that the Electrical Workers did not produce the administrative record until September 7, 2010, after Plaintiff filed the instant action, and (2) that the Electrical Workers have not produced the above-referenced documents, which do not appear in the administrative record.

Cir. 2000), the United States Court of Appeals for the Fourth Circuit set forth eight nonexclusive factors to be considered by courts in reviewing a plan administrator's decision for reasonableness:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342–43.  These factors continue to guide an abuse-of-discretion review under ERISA.  *See Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010); *DuBerry v. Life Ins. Co. of North America*, 632 F.3d 860, 869 (4th Cir. 2011).

Prior to the Supreme Court's issuance of *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), precedent called for review of a plan administrator's decision under a "modified abuse-of-discretion" standard.  *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997); *DuBerry*, 632 F.3d at 869.  Under this standard, when a plan administrator had a conflict of interest because the administrator was responsible for both evaluating and paying claims, courts would afford less deference to the administrator's decision.  *See Ellis*, 126 F.3d at 233; *DuBerry*, 632 F.3d at 869.  In *Glenn*, however, the Supreme Court clarified that the presence of such a conflict does not alter the applicable standard of review, but rather is "but one factor among many that a reviewing judge must take into account."  *Glenn*, 554 U.S. at 116; *DuBerry*, 632 F.3d at 869.

The *Booth* factors weigh strongly in Plaintiff's favor.

In the first instance, "the language of" the Electrical Workers' Plan includes no provisions

that authorize Defendants to "offset," "setoff," or in any way recoup an employer's alleged debts against an employee's vested pension benefits. *See Booth*, 201 F.3d at 342-43 ("the language of the plan" listed as the first of eight nonexclusive factors for a court to consider when reviewing a plan administrator's decision for reasonableness). And, as already pointed out in the summary of the record, Defendants have implicitly admitted that they did not rely on any Plan language in making their decision. *See* A.R. 23-25; Am. Compl. ¶¶ 20-22, 36-38; Answer ¶¶ 20-22. Similarly, the slim quantity of materials considered by Defendants (as reflected by the administrative record) when determining to terminate and rescind Plaintiff's pension benefits are woefully inadequate, and do not support their decision. *See Booth*, 201 F.3d at 342-43 ("the adequacy of the materials considered to make the decision and the degree to which they support it" listed as the third of eight nonexclusive factors for a court to consider when reviewing a plan administrator's decision for reasonableness).

It practically goes without saying that Defendants' decision to terminate Plaintiff's benefits was inconsistent with their earlier decision to pay the benefits. *See Booth*, 201 F.3d at 342-43 ("whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan" listed as the fourth of eight nonexclusive factors for a court to consider when reviewing a plan administrator's decision for reasonableness). Plaintiff applied for benefits in March 2008 and shortly thereafter began receiving them – thus, the Trustees had to have approved Plaintiff's claim, *see* A.R. 161, and the decision to terminate the benefits, which the record discloses was based on no additional evidence, was inconsistent with the earlier decision to award the benefits.

Furthermore, my review of the record indicates that Defendants' decision to terminate and rescind the benefits was neither reasoned nor principled, *see Booth*, 201 F.3d at 342-43

("whether the decisionmaking process was reasoned and principled" listed as the fifth of eight nonexclusive factors for a court to consider when reviewing a plan administrator's decision for reasonableness), nor "consistent with the procedural and substantive requirements of ERISA," *id.* (the sixth of the eight factors).  The administrative record presents a history of repeated violations of ERISA (and the Plan) by Defendants' failure (or refusal) to include certain information in the termination letter and the appeal denial letters (such as information regarding Plaintiff's rights under ERISA to file suit or to request Plan documents), or the failure (or refusal) to supply documents and information when requested to do so by Plaintiff and Plaintiff's counsel.[21]

Given the facts in the record before me, I find that I must consider Defendants' conflict of interest in this matter.  *Id.* (the eighth *Booth* factor).  The Electrical Workers serve the dual role of evaluating claims for pension benefits and paying the claims, *see Phillips v. Brink's Co.*, 632 F. Supp. 2d 563, 571 (W.D. Va. 2009) (ruling that the pension plan and plan administrator operated under a conflict of interest), and, as I have already observed, the presence of such a conflict is "one factor among many that a reviewing judge must take into account," *Glenn*, 554 U.S. at 116.

## 2.

Defendants' decision to terminate Plaintiff's pension benefits and deny his administrative appeals are not based on "substantial evidence."[22]  *See, e.g., Bernstein*, 70 F.3d at 788 (fiduciary

---

[21] Elsewhere in this opinion, I examine Plaintiff's claims under 29 U.S.C. 1132(c)(1), and discuss Defendants' repeated failure (or refusal) to provide Plaintiff with Plan documents despite numerous written requests from Plaintiff and his counsel.

[22] Indeed, the evidence in the administrative record shows that, even assuming that Defendants had the right to execute a "set-off" of Plaintiff's vested pension benefits (and they do not have any such right), (continued...)

decision is reasonable only if it is based on substantial evidence).  The record indicates that the Electrical Workers first considered terminating and rescinding Plaintiff's pension benefits around May 30, 2008, when an unidentified individual drafted the "Appeal to the Members of the Board of Trustees June 18, 2008."  A.R. 91.  The Trustees held a meeting on June 18, 2008, and terminated Plaintiff's benefits, communicating this to Plaintiff in the termination letter of July 23, 2008.  A.R. 89-90, 91.  The termination letter states that NSR (not Plaintiff) owed the Plan funds and assets, that Plaintiff had "converted" these funds from NSR, and, therefore, Plaintiff had "constructively received" any pension benefit owed to him.  A.R. 89.  Presumably,

---

[22](...continued)
their decision was unreasonable, given that their numbers were not supported by any evidence; even more significantly, their numbers did not add up.

In their termination letter of July 23, 2008, the Electrical Workers claimed that NSR owed the Plan "$18,347.87 and liquidated damages and interest in the amount of $3,669.57."  A.R. 89.  According to the Electrical Workers' own calculations (which Plaintiff disputes), the total value of Plaintiff's pension benefits was at least $49,191 (as of October 1, 2008).  A.R. 73.  Using these figures, simple math indicates that Plaintiff is entitled to at least $27,173.56 in benefits (because $49,191 minus $18,347.87 minus $3,669.57 = $27,173.56).  Yet, the Electrical Workers terminated Plaintiff's pension benefits in their entirety, and that decision – to terminate all of Plaintiff's benefits – is clearly unreasonable.

Later in the appeal process the Electrical Workers raised their calculation of the alleged debt owed by NSR from the initial claim of $22,017.44 to $174,455.30.  A.R. 25.  However, the latter figure post-dates the termination, and cannot form the basis for the decision to terminate.  To be sure, in their motion for summary judgment, Defendants asserted that NSR's debt was $50,333.  This figure also post-dates the termination, and cannot form the basis for the decision to terminate.  Defendants' figures are unsupported and contrary to the information in the administrative record.  Indeed, Defendants have failed to provide any factual information to support any calculation of debt owed by NSR.

The "Appeal to the Members of the Board of Trustees June 18, 2008" states that NSR "became delinquent and continues to owe a total of $174,455.30 to the various Local No. 26 IBEW-NECA Trust Funds, including $18,347.87 in pension contributions and $3,669.57 in pension liquidated damages and interest."  A.R. 91.  Thus, the $174,455.30 figure does not represent the amount allegedly owed by NSR to the Pension Plan.  Instead, NSR allegedly owes only $22,017.44 *to the Pension Plan*, A.R. 89- 90, 91, and the remaining $152,437.86 apparently represents debts allegedly owed by NSR to *unidentified Local No. 26 IBEW-NECA Trust Funds* that are separate and distinct from the Pension Plan and the pension plan benefits at issue in this matter, A.R. 91.  And, although there may be a trust fund for disability or health benefits to which NSR allegedly owes some amount of funds, if any such trust funds or debts actually exist, they are completely unrelated to Plaintiff, Plaintiff's pension benefits, the Pension Plan, and NSR's alleged debt to the Pension Plan.  Any such trust funds are administered by unidentified entities and governed by agreements and documents that have never been produced or filed with the court by Defendants.  In any event, such unknown debts allegedly belonging to NSR's unidentified creditors do not affect Plaintiff's claim for pension benefits.

-25-

at the time the Electrical Workers made this termination decision, they possessed and relied upon certain documents and information.  One must assume that the Electrical Workers had an accounting of the benefits owed to Plaintiff and an accounting of NSR's alleged debts to the Plan, although no such information appears in the record.  The "Appeal to the Members of the Board of Trustees June 18, 2008" expressly states that Plaintiff had violated a Collective Bargaining Agreement (A.R. 91); therefore, the Electrical Workers must have based their decision, in part, on the terms of the Collective Bargaining Agreement, yet the Collective Bargaining Agreement does not appear in the record.

When reviewing a plan administrator's decision, even "under a deferential standard, the district court is limited to the evidence that was before the plan administrator at the time of the decision." *Bernstein*, 70 F.3d 788.  When the termination letter of July 23, 2008, was issued, the only document in the administrative record relevant to Plaintiff's claim for benefits upon which Defendants could have relied is the 2004 SPD, which provides no factual basis for Defendants' decision to rescind and terminate Plaintiff's benefits.[23]   A.R.  119-202.  Likewise, the administrative record provides no support for Defendants' decision to deny Plaintiff's appeals.[24]

---

[23] Much of the administrative record consists of documents upon which the Electrical Workers did not rely on making their decision.  For example, it does not appear that the Electrical Workers relied on the 2004 SPD (A.R. 119-202), Plaintiff's bankruptcy records (A.R. 96-115), or the Health Plan SPD (A.R. 203-294).  These documents account for 193 pages of the 294 page administrative record.

The 2004 SPD contains no information suggesting that Plaintiff had "converted" funds from NSR, and it provides no provisions for recovering allegedly "converted" funds from Plaintiff's vested pension benefits.  Similarly, it provides no information regarding NSR's debts to the Plan, and no provisions for recovering such debts from Plaintiff's vested pension benefits.  Nor does it contain any information indicating that Plaintiff had "constructively received" or had been "overpaid" his pension benefits, and it contains no provisions for recouping such "constructive receipt" of benefits.

[24] The documents in the administrative record that Defendants had before them when they denied the appeal include the 2004 SPD, Plaintiff's appeal letters (A.R. 40-41), Plaintiff's complaint against the Bank (A.R. 48-58), and Plaintiff's May 2009 letter to the Bank (A.R. 59).  None of these documents support Defendants' claim that Plaintiff had been "overpaid" and "constructively received" pension benefits.  The
(continued...)

**3.**

Neither ERISA nor the Plan provide any basis for Defendants' apparent legal assumption that they could terminate Plaintiff's pension benefits by offsetting those benefits against NSR's alleged debts to the Plan (and other entities).   Although Defendants allege that Plaintiff was "overpaid" in "constructively received" pension benefits, *see* A.R. 25 (the Electrical Workers' "accounting" of Plaintiff's "Pension overpayment"), this claim is based on NSR's alleged debts to the Plan (and other entities), *see* A.R. 89-90, 91 (asserting NSR's debts to the Plan and "the various Local No. 26 IBEW-NECA Trust Funds").   However, Defendants have never attempted to assert any claims against NSR (or, for that matter, against Plaintiff) to recover these debts.

In situations involving benefit overpayments, plan fiduciaries normally assert claims against participants seeking equitable restitution pursuant to ERISA § 1132(a)(3).   *See, e.g.*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002) (ruling fiduciary's attempt to recover overpayment under participant's contractual obligation, brought as a claim for an equitable lien sought as a matter of restitution, was an action at law and not available under

---

[24](...continued)
documents support the assertions in Plaintiff's appeal letters that he did not and could not have taken any funds from NSR.   A.R. 48-58, 59.   There are no documents in the record indicating that Plaintiff took any funds belonging to NSR or the Plan.   Defendants' assertion, in the appeal denial dated March 12, 2009, that Plaintiff had settled the lawsuit against the Bank and therefore had either "received recovery from the Bank or . . . settled away NSR's right of recovery against the Bank, thus depriving NSR's creditors from recovery, or both," A.R. 28, is completely unsupported by any evidence in the administrative record.   Indeed, as part of his second appeal, Plaintiff produced to Defendants' counsel, on April 7, 2009, a copy of the confidential Settlement Agreement denominated "for attorney's eyes only."   A.R. 31-38.   (Notwithstanding an apparent meeting of the minds between the parties' counsel that the document would not be shared with Defendants, it is included in the administrative record Defendants submitted to the court.)   The Settlement Agreement shows that, in exchange for the release of the Bank's lien on real property Plaintiff (and his wife) agreed to pay the Bank $75,000 and to assign a $600,000 life insurance policy to the Bank.   This does not support Defendants' claim that Plaintiff "received recovery from the Bank," or "settled away NSR's right of recovery against the Bank," or "depriv[ed] NSR's creditors from recovery."   A.R. 28.   Even though there is no evidence in the record to support Defendants' claims or actions, they denied Plaintiff's second appeal, stating that "the evidence submitted to date is not sufficient to warrant overturning the determination that [Plaintiff] has already constructively received his pension benefits."   A.R. 10.

ERISA § 1132(a)(3)).  Furthermore, any such claim for restitution by the Electrical Workers is barred by ERISA's limitation on actions by fiduciaries against beneficiaries; although ERISA allows fiduciaries to file actions for "equitable relief" under § 1132(a)(3), claims against participants and beneficiaries for restitution must comply with (1) equitable principles and/or (2) the terms of the Plan.  *See Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356, 364-65 (2006) (ruling fiduciary's claim for an equitable lien "by agreement" was authorized by the plan documents and available under § 1132(a)(3)); *Knudson*, 534 U.S. at 214-15 *(*ERISA § 1132(a)(3) allows fiduciaries to recover equitable relief, but not legal relief).  In *Knudson*, the Supreme Court observed that,

> [i]n cases in which the plaintiff "could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution *at law* through an action derived from the common law writ of assumpsit.  In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money."  Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).
>
> In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. . . .  Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

534 U.S. at 213-14 (citations omitted).

To summarize, the fiduciary plaintiff in *Knudson* sought to recover funds that were not in the beneficiary defendant's possession, and therefore, the plaintiff's claim for restitution arose at law and was not available under § 1132(a)(3).  *Id.* at 213.  The same analysis applies to Defendants' actions here.  Defendants have not attempted to recover "equitable relief" from

Plaintiff pursuant to § 1132(a)(3) and, even if they had, there is no evidence that the funds sought by Defendants have ever been in Plaintiff's possession, and thus any such claim would be contrary to ERISA.  *See Knudson*, 534 U.S. at 214.  The administrative record, which I have summarized in some detail above, relates to Plaintiff's claim for pension benefits, and not Defendants' claims against NSR, and provides no indication that Plaintiff had any possession or control over NSR's assets and property after the Bank seized NSR.

Essentially, Defendants' decision to terminate Plaintiff's benefits seeks to recover funds that apparently never have been (and never will be) in Plaintiff's possession.  In any event, the claim for restitution embodied in Defendant's decision to terminate and rescind Plaintiff's benefits arises at law and is unavailable under § 1132(a)(3).  *See Knudson*, 534 U.S. at 214; *see also Sereboff*, 547 U.S. at 365 (interpreting *Knudson* as ruling that "equitable restitution was unavailable because the funds sought were not in [beneficiary's] possession").

Nor can Defendants claim an equitable lien "by agreement" or assignment.  *See Sereboff*, 547 U.S. at 364-65 (distinguishing "an equitable lien sought as a matter of restitution" from "an equitable lien 'by agreement'").  In *Sereboff*, the Supreme Court ruled that an express provision in the plan documents allowed the fiduciary to recover funds from a beneficiary, even though the fiduciary might not be able to satisfy the "strict tracing rules" normally associated with equitable restitution.  *Id*. at 363-68.  The plan in *Sereboff* included an "Acts of Third Parties" provision identifying a particular fund ("[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise)") and entitling the fiduciary to recover a particular share of that fund from participants and beneficiaries.  *Id*. at 364.  The Court ruled that "[t]his rule allowed [the plan fiduciary] to 'follow' a portion of the recovery 'into the [participants'] hands' 'as soon as [the settlement fund] was identified,' and imposed on that portion a constructive trust or equitable

lien." *Id*. (quoting *Barnes v. Alexander*, 232 U.S. 117, 123 (1914)).  Here, however, there is no provision in the 2004 SPD similar to the "Acts of Third Parties" provision in the *Sereboff* plan. Indeed, the Electrical Workers implicitly (but unequivocally) admitted during the administrative appeal process that they did not rely on any provision in the Plan when they terminated Plaintiff's benefits.  A.R. 18.  None of the Electrical Workers' three decision letters state or rely on any Plan provision.  *See* A.R. 9-11, 27-29, 89-90; Am. Compl. ¶¶ 20-22, 36-38; Answer ¶¶ 20-22, 36-38.  Moreover, when Plaintiff's counsel expressly asked the Electrical Workers if they were relying on any Plan provisions or ERISA statutes or regulations, the Electrical Workers' representative could not cite a single provision.  A.R. 18-19.  Instead, the Electrical Workers' counsel provided an inept analogy involving a hypothetical dispute between Olive Garden and an imaginary customer; explicitly missing from the Electrical Workers' rather dopey response is any reference to the terms of the Plan or any citation to ERISA.[25]  A.R. 18.  The 2004 SPD

_____

[25] To recapitulate, on May 13, 2009, counsel for Plaintiff sent an e-mail to Defendants' representative (Defendants' counsel in the instant matter) explicitly inquiring

> about the basis or authority that the Union has to stop payment on the benefits in question due to the Union's determination that [Plaintiff] has constructively received any pension benefit due to him based on his 10.25 years of pension credit.
>
> Is there a law, statute, or administrative regulation that allows the Union to stop payment based on the theory it has asserted regarding [Plaintiff]?  Does the Pension Trust Fund authorize the Union to stop payment based on its asserted theory?  Is the Union relying on common law regarding setoff?

A.R. 19.  On May 19, 2009, Plaintiff's co-counsel wrote to Defendants' representative, stating:

> I'm still struggling on the legal basis (as well as the factual basis which I'll put aside for the moment) for the Union's actions.  I fully understand the concept of a set-off but before going into a lot more detail didn't know if there was also some concept in the Union's pension documents, ERISA law or some other concept that provided the legal basis for the actions taken.  We truly want to resolve this issue with as little controversy as possible and thus if we are overlooking some legal basis other than simply a setoff theory please let us know.

(continued...)

confirms that Defendants did not and could not have relied upon any provision of the Plan, as there is absolutely no provision in the Plan that authorizes the Electrical Workers to recover, out of a pension participant's vested pension benefits, funds owed to the Plan by an employer.[26]

**4.**

Throughout the administrative process, Defendants have acknowledged that the Plan owes Plaintiff pension benefits based on "10.25 years of pension credit" earned by Plaintiff. However, Defendants maintain that, because NSR allegedly owes the Plan (and, apparently, other entities)

---

[25](...continued)

*Id.*

Instead of a straightforward (or timely) answer, Defendants' representative responded (on July 22, 2009) as follows:

> *Other than my client's **position** that [Plaintiff] has been paid amounts in excess of his pension, I am at a loss as to what exactly you are looking for.* While the theory of "set-off" comes to mind, I am not sure that would be an accurate description of what has occurred. Typically a "set-off" (as you put it) or "offset" (as I have also seen; I will assume for now that the 2 terms are interchangeable) would involve reducing ongoing payments by an amount representing a prior overpayment. In this case, he has already been paid in excess of the full amount, so there is nothing to "set off."
>
> *A rough analogy to this would be if the Olive Garden sued me for the price of my meal, but I had already paid for the meal. I would not say, in my defense, that the amount due to Olive Garden for my meal should be "offset" by the amount of money that I had already paid; rather, I would just say that I already paid.*

A.R. 18 (emphases added). I underscore that the "client's *position* that [Plaintiff] has been paid amounts in excess of his pension" is nothing more than a bald, unsupported assertion. *Id.* (emphasis added).

[26] The only provisions in the Plan regarding employer liability (and Plaintiff was an "employee," not an "employer") refer to an employer's "withdrawal liability." A.R. 190-200. These provisions are specifically defined, and include specific procedural requirements, such as notices, arbitration provisions, and payment schedules, that must be followed in order for the Plan to recover against an employer's withdrawal liability. A.R. 196-200. Indeed, there is an entire subtitle of ERISA devoted to claims by multi-employer plans against employers for withdrawal liability. *See* 29 U.S.C. §§ 1381, *et seq.* The Electrical Workers have not followed any of the Plan's procedural requirements for notifying NSR of any withdrawal liability, nor have they ever attempted to state a claim against NSR for withdrawal liability pursuant to ERISA law. In sum, the Electrical Workers have no authority whatsoever to make an extrajudicial decision that Plaintiff is personally liable for restitution of any alleged withdrawal liability of NSR, and cannot recover NSR's alleged debts from Plaintiff's vested pension benefits.

for missed benefit contributions dating from approximately 2004, Plaintiff has "constructively received" any pension benefit owed to him by the Plan.[27]   *See*, *e.g.*, A.R. 89-90.   In other words, Defendants actions in terminating and rescinding Plaintiff's benefits claimed a setoff, or recoupment, in which Plaintiff's claim for his vested pension benefits was setoff against NSR's debts to the Plan and other unidentified entities.

""It is elementary that one who asserts a setoff must prove his claim." *Broaddus v. Gresham*, 181 Va. 725, 735 (1943).   As already explained, Defendants' claim of setoff or recoupment is unsupported by any facts in the administrative record.   Furthermore, the theory fails because the two claims – (1) Plaintiff's benefit claim against the Plan, and (2) the claims by the Plan and others against NSR – lack the basic "mutuality" required for setoff or recoupment. In Virginia, "both at law and in equity, an essential requisite [of recoupment and setoff] is that the debts must be mutual, that is, they must be owing between the same parties."   *Id.* (citations omitted).   The two demands must be "in the same right."   *First Nat'l Bank of Waynesboro v. Johnson*, 183 Va. 227, 237-38 (1944).   "A debt due from a partner cannot be set up against a partnership demand, nor *vice versa*, nor can a debt due to one as executor, administrator, or trustee, be set up against one in his own right, nor *vice versa*."   *Id.* (quoting Burks Pl. & Pr. (3d ed.), at 398, and citing *Dakin v. Bayly*, 290 U.S. 143 (1993)).   Likewise, a debt due from a corporation cannot be set up against a demand made by an individual who happens to be the corporation's officer or director.   *Id.*   Any such claim would violate the requirement of mutuality of parties and claims.   *Id.*

---

[27] As set forth in the summary of the record, the termination letter of July 23, 2008, asserted that NSR owes the Plan a total of $22,017.44, an amount that is less than Plaintiff's total pension benefit amount.   The Electrical Workers later attempted to claim that NSR also owes additional funds to other unidentified entities; however, these debts have no relation to Plaintiff, his claim for pension benefits, or NSR's alleged debts to the Pension Plan.

Plaintiff has a valid claim to receive vested pension benefits based on his 10.25 years of pension credit earned from 1981 to 1992 and Defendants do not dispute Plaintiff's right to these pension benefits. *See* A.R. 27-29 (claiming Plaintiff's benefit claim had "not been denied outright"). Instead, they are attempting to setoff or recoup Plaintiff's demand for benefits against NSR's alleged debts to the Plan and others. But Plaintiff is not NSR, and NSR was not Plaintiff. It is a basic tenet of law that corporate entities are separate and distinct from their officers and directors. *See*, *e.g.*, *West v. Costen*, 558 F. Supp. 564, 585 (W.D. Va. 1983)[28] Defendants cannot setoff or recoup Plaintiff's pension benefits against NSR's alleged debts because the two claims lack mutuality of parties. Indeed, Defendants admit that NSR owes most

_____

[28] *West v. Costen*, 558 F. Supp. 564, 585 (W.D. Va. 1983), stated the following:

A corporate entity generally will be recognized as a separate entity, functioning through its officers and directors, to which its creditors must look for satisfaction of debts and obligations incurred in the corporate name. "The very purpose of the corporate structure is the advancement of limited liability of investors with an underlying legislative policy directed to the encouragement of investments. Consequently, the corporate structure should never lightly be disregarded."

Quoting *In re County Green Ltd. Partnership*, 438 F. Supp. 701, 705 (W.D. Va. 1977), *rev'd*, 604 F.2d 289 (4th Cir. 1979) (district court erred in reversing bankruptcy court's decision not to pierce corporate veil because such was not clearly erroneous)).

Even if Defendants had factual support for a claim against NSR, and had pursued such claim against NSR, there is no evidence to support Defendants' attempt to recover from Plaintiff personally. Defendnats assert (without support) that NSR "is a signatory" to the Collective Bargaining Agreement, but they do not and cannot allege that Plaintiff was a signatory to the undisclosed Collective Bargaining Agreement. There is simply no evidence indicating that NSR was an alter ego for Plaintiff or that Defendants (and other unidentified entities) should be able to "pierce the corporate veil" and recover Plaintiff's vested pension benefits. "Piercing the corporate veil is not itself an independent ERISA cause of action, 'but rather is a means of imposing liability on an underlying cause of action.'" *Peacock v. Thomas*, 516 U.S. 349, 353 (1996) (dismissing participant's attempt to pierce corporate veil against individual officer of former employer). As the United States Court of Appeals for the Fourth Circuit has ruled, Virginia law imposes a particularly "rigorous standard" of proof of, among other things, "some legal wrong" before a claimant may pierce the veil and recover from a corporate officer. *Perpetual Real Estate Servs., Inc. v. Michaelson Properties, Inc.*, 974 F.2d 545, 548-49 (4th Cir. 1992). The evidence submitted by Defendants does not come close to meeting this rigorous standard and, more importantly, any such claim should be asserted in a judicial proceeding, not an ERISA administrative proceeding.

of the alleged debt to unidentified entities that are distinct from the Pension Plan. A.R. 91. Therefore, there can be no mutuality, given that NSR owes funds to entities that have no relation to Plaintiff, Plaintiff's claim for benefits, the Pension Plan, the Trustees' decision to terminate Plaintiff's benefits, or NSR's alleged debts to the Pension Plan.

Defendants' theory fails not only because of a lack of mutuality of parties, but also because of a lack mutuality of claims. *See Johnson*, *supra*,183 Va. at 237-38 (setoff or recoupment must arise "in the same right"). Plaintiff's claim for benefits arises out of his vested pension benefits. Plaintiff is entitled to these benefits by virtue of the "10.25 years of pension credit" he earned by working for employers from 1981 to 1992. A.R. 89-90, 91. Conversely, Defendants' claim against NSR arises out debts that NSR allegedly failed to pay as a plan "employer" from approximately 2004 (the date of NSR's financial collapse and seizure by the Bank). A.R. 89-90, 91. These two claims arise out of two separate and unrelated causes of action, and Defendants' theory of setoff or recoupment cannot support their termination of Plaintiff's benefits.

## B.

### 1.

Section 1132(c)(1) of ERISA provides, *inter alia*, that any plan administrator:

> who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to [$110] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. 1132(c)(1) (setting amount at $100 per day); 29 C.F.R. § 2575.502c-1 (raising

authorized amount to $110 per day, effective August 1999); *see also Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir.1996); *Mullins v. AT&T Corp.*, 2011 WL 1491223 *7 (4th Cir. April 20, 2011).  Furthermore, each separate failure by the plan administrator to produce plan documents within 30 days of request "shall be treated as a separate violation."  29 U.S.C. 1132(c)(1)(B)

"Two factors generally guide [the] district court's discretion: prejudice to the plaintiff and the nature of the administrator's conduct in responding to the participant's request for plan documents." *Davis v. Featherstone*, 97 F.3d 734, 738 (4th Cir.1996) (furthermore, a court may consider the "frustration, trouble, and expense" suffered by the claimant "in deciding whether to impose a penalty," including the "the trouble and expense of engaging an attorney to obtain the documents"); *see also Faircloth*, 91 F.3d at 659 (observing that the court may consider prejudice and bad faith in exercising its discretion:  "[P]rejudice is a factor that a district court may consider in deciding whether to impose a penalty.  The district court may also consider whether the administrator acted in bad faith.").  "Although prejudice is a pertinent factor for the district court to consider, it is not a prerequisite to imposing a penalty." *Davis*, 97 F.3d at 738; *see also Chaffin v. NiSource, Inc.*, 703 F. Supp. 2d 579, 594-95 (S.D. W.Va. 2010).  It is also not necessary that the plan administrator's conduct rise to the level of bad faith. *Id*.  Rather,

> [t]he purpose of the penalty provision is to provide plan administrators with an incentive to meet requests for information in a timely fashion.  When there is some doubt about whether a claimant is entitled to the information requested, the Supreme Court has suggested that an administrator should err on the side of caution.

*Id*. (citation omitted); *see also Faircloth*, 91 F.3d at 659 ("The purpose of [§ 1132(c)(1) ] is not to compensate participants for injuries, but to punish noncompliance with ERISA.").

-35-

**2.**

Plaintiff requested Plan documents from the Trustees on four occasions, beginning with Plaintiff's letter of July 27, 2008, drafted by Plaintiff prior to retaining counsel, requesting "my original paperwork that I signed in 1981," "paperwork for NSR Electrical, Inc. which was executed in 1992-3," and "the basis for [Defendants'] denial of [Plaintiff's] pension from the above reference[d] documentation."  *See* Docket no. 39, attachment 3.  The July 27, 2008, request for documents clearly notified Defendants that Plaintiff desired the paperwork and documentation upon which they had based their decision to deny his benefits.  At the very least, Defendants were required to respond by producing the Plan document or SPD.  *See* 29 U.S.C. § 1024(b)(4) (requiring production of the SPD upon request).  Furthermore, Defendants were required to produce a copy of the Collective Bargaining Agreement, given that they based their decision on the document, and they were required to produce the document in response to a written request.  *Id*. (requiring production of any bargaining agreements upon request).  The record reflects that Plaintiff sent this request on July 27, 2008, but he never received any response to the request.

Plaintiff's second written request was made by counsel on September 3, 2009.  A.R. 15.  The letter of September 2009 requested, "pursuant to [ERISA], . . . all plans, policies, or contract documents of the [Plan.]"  *Id*.  Defendants admit that Plaintiff made this request.  Am. Compl. ¶ 101; Answer ¶ 101.  "[A]ll plans, policies, or contract documents of the [Plan]" would have included at least the SPD, the Collective Bargaining Agreement, the Trust Agreement, and any contracts establishing or maintaining the Plan.  29 U.S.C. § 1024(b)(4).  Defendants produced the non-current 2004 SPD on May 11, 2010, and have never produced the Collective Bargaining Agreement, the Trust Agreement, or any Plan contracts.

Plaintiff's counsel issued the third written request on November 5, 2009, requesting the "plan documents, policies, and contracts . . . pursuant to ERISA."  A.R. 13.  Defendants admit that this request was made.  Am. Compl. ¶ 106; Answer 106.  As with Plaintiff's September 2009 request, the November 2009 request sought production of the SPD, Collective Bargaining Agreement, Trust Agreement, and any other contracts establishing or maintaining the Plan.  29 U.S.C. § 1024(b)(4).  While Defendants produced a non-current SPD on May 11, 2010, they never produced any of the other requested documents.

Having received no response to these requests, Plaintiff's counsel on February 10, 2010, made yet another written request for Plan documents in which the specific Plan documents were expressly identified.  A.R. 3-4.  The February 10, 2010 letter requested (1) the "current" SPD; (2) the "annual report;" (3) the "bargaining agreements;" (4) the "trust agreements;" and (5) any "contracts . . . under which [the Plan] was established or is operated."  A.R. 3-4.  The letter explicitly states that "[t]his request for Pension Plan documents is made pursuant to 12 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2575.502c-1 of ERISA," specifically referencing ERISA's statutory damages provision.  A.R. 4.  Defendants admit that Plaintiff requested these documents from the Trustees.  Am. Compl. ¶ 111; Answer ¶ 111.  Although Defendants produced the non-current 2004 SPD on May 11, 2010, they have not produced the other documents.

### 3.

The Trustees are the plan administrator for the Plan.  They have authority to interpret and apply the provisions of the Plan (A.R. 179), and they made the decisions to terminate Plaintiff's pension benefits and deny his administrative appeals.  *See*, *e.g.*, A.R. 89-90, 91.  ERISA requires plans and plan administrators to draft and produce SPDs to participants and beneficiaries.  29 U.S.C. § 1022.

Plaintiff and his counsel made four separate written requests for documents from Defendants pursuant to ERISA.  Defendants failed to produce several documents in response to multiple requests.  Nonetheless, my review of the record confirms the existence and non-production of certain documents.

There exists a Plan document or SPD.  The administrative record includes a Plan document or SPD, produced by Defendants on May 11, 2010.  A.R. 119-202.  However, ERISA requires production of "the latest updated summary [] plan description."  29 U.S.C. § 1024(b)(4).  The document produced by Defendants states that it is "Restated October 1, 2004," A.R. 119, and it is obvious that it is "restated" and amended each year, s*ee* A.R. 165-166 (adjusting and amending benefit calculation each year from 1976 to 2004).  Defendants confirm this, admitting that there are other current Plan documents other than the "SPD" document produced on May 11, 2010.  Am. Compl. ¶ 77; Answer ¶ 77.  Plaintiff's four requests for Plan documents were made in 2008, 2009, and 2010. Thus, it appears that Defendants, despite receiving numerous requests, still have not produced a copy of "the latest updated" SPD, and therefore continue to be in violation of ERISA.

There exists a Collective Bargaining Agreement for the Plan.  Pursuant to ERISA, it must be produced upon written request.  29 U.S.C. § 1024(b)(4).  The SPD produced by Defendants references the Collective Bargaining Agreement, *see*, *e.g.*, A.R. 125, 130; moreover, Defendants relied upon the Collective Bargaining Agreement when they determined to terminate Plaintiff's benefits.  A.R. 91 (alleging Plaintiff "violat[ed] the collective bargaining agreement").

There exists a trust agreement establishing and maintaining the Plan.  Pursuant to ERISA, it must be produced upon written request.  29 U.S.C. § 1024(b)(4).  The SPD references the "Agreement and Declaration of Trust Establishing the Electrical Workers Local No. 26 Pension

Trust Fund originally entered into as of July 1, 1961, as amended and restated" (the "Trust Agreement").  *See*, *e.g.*, A.R. 126.  The Trust Agreement appointed and governs the Trustees and their authority to control the Plan and its assets.  A.R. 126.

Although no annual reports have been produced in response to Plaintiff's requests, there must exist an annual report for the Plan:  ERISA requires plans and plan administrators to draft and publish annual reports regarding a plan's finances and actuarial information.  29 U.S.C. § 1023.  Upon written request, plan administrators must produce a copy of the "latest annual report."  *Id*. § 1024(b)(4).

The Plan is operated, in part, pursuant to contracts.  For example, employer contributions (such as those made by Plaintiff's former employers from 1981 to 1992) are governed "pursuant to the terms of a written agreement with the Union or the Pension Fund."  A.R. 127.  The 2004 SPD references other agreements under which the Plan is governed.  *See*, *e.g.*, A.R. 124, 125 (referencing contracts governing employers and employees).  Upon written request, plan administrators must produce these contracts within 30 days.  29 U.S.C. § 1024(b)(4).

Accordingly, there exist at least five categories of documents that Defendants were obliged to produce to Plaintiff within 30 days of receiving his written request: (1) the Plan document or SPD; (2) the Collective Bargaining Agreement; (3) the Trust Agreement; (4) the Annual Report; and (5) any other contracts upon which the Plan was established or maintained.  29 U.S.C. § 1024(b)(4).  However, rather than producing the requested documents, Defendants delayed production and failed to produce for a cumulative number of over 5,000 days.  *Id*. § 1132(c)(1)(B) (each separate failure by the plan administrator to produce plan documents within 30 days of request "shall be treated as a separate violation").

Although prejudice is not required for an award of statutory damages, the facts here

suggest that Plaintiff suffered great prejudice due to Defendants' late production and non-production of Plan documents.  First, Plaintiff was obliged to retain counsel.  Second, Plaintiff and his counsel were severely prejudiced by having to pursue the administrative claim and appeal process without the Plan document or SPD.  Furthermore, Defendants claimed to have based their decision to terminate and rescind benefits on Plaintiff's alleged violation of the Collective Bargaining Agreement, yet Defendants have refused to produce the Collective Bargaining Agreement.  Thus, Plaintiff (and, for that matter, the court) cannot determine exactly which terms, if any, of the Collective Bargaining Agreement he is alleged by Defendants to have violated.  Furthermore, the facts in this case support a finding of bad faith on the part of Defendants in their refusal to produce documents.  Defendants did not merely ignore a single request for documents.  They ignored four separate written requests, three of which expressly state that they are made pursuant to ERISA.  The final December 2009 request expressly identified each document requested and referenced the statutory penalty for failing to timely produce the documents.  Still, Defendants failed to timely produce any of the requested documents.  Indeed, Defendants apparently continue to refuse to produce the Collective Bargaining Agreement, Trust Agreement, Annual Reports, and other Plan contracts.  Defendants continued failure – or refusal – to produce documents upon which they based their adverse benefit determinations demonstrates bad faith, and they cannot claim ignorance or mistake.[29]

---

[29] On summary judgment, Defendants assert, *inter alia*, that McChesney & Dale, P.C. ("McChesney"), Defendants' counsel here and their representative at all times throughout the administrative appeal, *see* n. 16, *supra*, was counsel for the Plan only, and not the Trustees, and they claim that, even if they are counsel for the Trustees, requests to counsel, rather than directly to the plan administrator, are unenforceable under § 1132(c).

The assertion that document requests to counsel are unenforceable because § 1132(c) imposes liability on plan administrators (here, the Trustees) is contrary to law and, moreover, it is contrary to the admissions in Defendants' answer and is thus barred by judicial estoppel.  Plaintiff's amended complaint

(continued...)

Were I to award the full amount of statutory damages of $110 per day, Defendants would be liable for over half-a-million dollars.  Plaintiff states that he "does not expect the Court to award" that amount, but he does not propose an alternative dollar amount, suggesting only that

---

[29](...continued)
alleged that he had "requested Plan documents from the Trustees" on September 3, 2009, November 5, 2009, and February 10, 2010.  (Am. Compl. ¶¶ 101, 106, 111).  These allegations refer to the document requests in Plaintiff's counsel's letters to McChesney, and they are contained in the administrative record.  *See* A.R. 3-4, 13, 15.  The allegation that Plaintiff requested "Plan documents from the Trustees" is a factual allegation (as opposed to a legal conclusion).  Defendants admitted each one of these factual allegations.  Answer ¶ 101, 106, 111).  "'[A] party is bound by the admissions of his pleadings.'"  *Lucas v. Burnley*, 879 F.2d 1240, 1242-43 (4th Cir. 1989) (quoting *Best Canvas Products & Supplies v. Ploof Truck Lines*, 713 F.2d 618, 621 (11th Cir. 1983)); *see Brown v. Sikora & Assocs., Inc.*, 311 Fed. Appx. 568, 571, 2008 U.S. App. LEXIS 8197, *8 (4th Cir. 2008) (employer barred from alleging it was an ERISA fiduciary based on inconsistent statements in pleadings); *Korangy v. US FDA*, 498 F.3d 272, 275-76 (4th Cir. 2007) (party could not "be heard to challenge" a factual issue "it previously admitted").  Furthermore, "[a] judicial admission is usually treated as absolutely binding" on the party admitting the factual allegation.  *New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963); *see also Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264-65 (4th Cir. 2004) (ruling judicial admission applies to intentional waivers of legal arguments as well as factual allegations).  Admissions of fact "serve a highly useful purpose in dispensing with proof of formal matters and of facts about which there is no real dispute" and, therefore, "[o]nce made, the subject matter ought not to be reopened in the absence of a showing of exceptional circumstances."  *Id*.

Defendants' answer admitted that Plaintiff "requested Plan documents from the Trustees" on September 3, 2009, November 5, 2009, and February 10, 2010.  Am. Compl. ¶¶ 101, 106, 111; Answer ¶¶ 101, 106, 111.  These responses to Plaintiff's factual allegations constitute judicial admissions, and Defendants are barred from now asserting defenses that are directly contrary to their own responses in the answer.  *See Lucas*, 879 F.2d at 1242-43.  Defendants' admissions in the answer are "absolutely binding."  *See New Amsterdam*, 323 F.2d at 24.  They may not now take positions inconsistent with their own prior pleadings.  *See id*.  Furthermore, there are no "exceptional circumstances" to justify relieving Defendants from their own admissions.  *See id*.

Furthermore, this newly asserted defense is false.  McChesney, in fact, represented the Trustees during the claim administration, and there is no indication that Defendants were "laboring under a mistake" when they made the admissions.  *See id*.  Defendants and their counsel knew that Plaintiff had requested the Plan documents "from the Trustees."  "ERISA was not intended to force employees into a cat and mouse game in which the ability to obtain information, information to which the employee is entitled, is dependant on an employee's ability to decipher who the correct 'plan administrator' actually might be."  *Minadeo v. ICI Paints*, 2006 U.S. Dist. LEXIS 40460, *40 (N.D. Ohio June 19, 2006).  McChesney was, in fact, representing the Trustees at the time of their receipt of the document requests.  This conclusion is supported by the Trustees' administrative record, which includes the three letters from Plaintiff's counsel requesting documents: at the very least, McChesney received the document requests and forwarded them to their client, the Trustees.  McChesney was acting on behalf of and representing the Trustees at the time of the document requests:  McChesney drafted the termination and appeal denial letters.  These notices of "adverse benefit determinations" are not merely correspondence from one individual to another.  The notices are legally binding documents that are governed by federal law.  By drafting the adverse benefit determinations and providing them to Plaintiff and his counsel, McChesney was fulfilling the Trustees' fiduciary obligations to give Plaintiff notice of their decisions pursuant to the Plan and ERISA.

"the Court should award a sizeable amount of statutory damages. . . ."[30]

I will award statutory damages of $35 per day, for a number of days to be calculated upon consideration of Plaintiff's petition for attorney's fees and costs and proposed order of judgment, submitted as directed in the order accompanying this memorandum opinion.  In my view, this award is necessary to fulfill the purpose of § 1132(c)(1) of providing Defendants "with an incentive to meet requests for information in a timely fashion," and punishing Defendants for their undisputed "non-compliance with ERISA."  *Davis*, 97 F.3d at 738; *Faircloth*, 91 F.3d at 659.

## C.

Section 1132(a)(3) of ERISA allows plan participants to file suit "(A) to enjoin any act or practices which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."   Throughout the administrative claim and appeal process, Defendants have violated and continue to violate ERISA provisions and the terms of the Plan.  To recapitulate, Defendants' multiple violations include the inadequate termination and adverse determination letters that failed to include information and statements required by ERISA and the Plan.  Defendants further violated ERISA by refusing to produce a complete administrative record, including documents such as the "latest updated" SPD, the Collective Bargaining

---

[30] Courts regularly impose high statutory damages awards for failure to produce Plan documents.  *See Underwood v. Fluor Daniel, Inc.*, 1997 U.S. App. LEXIS 1410, *14-15 (4th Cir. 1997) (affirming maximum statutory damage award).  In *Brooks v. Metrica, Inc.*, 1 F. Supp. 2d 559, 569-70 (E.D. Va. 1998), the district court awarded $21,760 in ERISA statutory damages for a cumulative delay of 272 days ($80/day, or 75% of potential damage award).  The court in *Freitag v. Pan American World Airways*, 702 F. Supp. 128, 132 (E.D. Va. 1988) awarded a $100/day penalty (the maximum amount allowed at the time of ruling) even though there was no showing of bad faith on part of ERISA fiduciary.  Defendants' egregious actions in this case are substantially worse than the defendants' actions in *Underwood*, *Brooks*, or *Freitag*.

Agreement, Annual Reports, and the Trust Agreement.

Pursuant to 29 U.S.C. § 1133, ERISA plans must afford a "reasonable opportunity" for participants to have a "full and fair review" of any benefit termination or denial. Here, the 2004 SPD incorporates and implements the claims and appeal procedures set forth in 29 C.F.R. § 2560.503-1. Pursuant to § 2560.503-1(b)(1), a claims and appeal procedure shall be deemed "reasonable" only if it complies with the regulatory requirements. In order for a plan to provide a "reasonable opportunity for a full and fair review" of an adverse benefit determination, the plan must provide, among other things, "that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of all documents, records, and other information relevant to the claimant's claim for benefits." *Id*. § 2560.503-1(h)(2)(iii).[31] The notice of adverse benefit determination must clearly state the specific reasons for the adverse determination; refer to specific plan provisions supporting the decision; state any additional information or documents necessary to perfect a claim, and include an explanation of why such information is necessary; and state the participant's right to file suit under ERISA after an administrative appeal. *Id*. § 2560-.503-1(h)(2)(i-iv). And, the notice of an adverse benefit determination on appeal must, among other things, state the specific reasons for the determination; refer to the plan provisions supporting the decision; and state the claimant's right to receive copies of all relevant documents, records, and other information. *Id*. § 2560.503-1(j)(1)-(3).

---

[31] DOL Regulation 29 C.F.R. § 2560.503-1 distinguishes plans "established and maintained pursuant to a collective bargaining agreement" that sets forth or incorporates certain minimum procedural requirements. However, that section is inapplicable in this case, given that Defendants have failed or refused to produce to Plaintiff or this court a copy of the Collective Bargaining Agreement. Furthermore, there is no indication that such Agreement sets forth any requirements different from those in subsections (b), (e), (f), (g), (h), (i), and (j) of 503-1.

-43-

Defendants' termination letter of July 23, 2008 (A.R. 78-79), violated ERISA § 1133 and 29 C.F.R. § 2560.503-1 by failing to state the specific reasons for the benefit termination; failing to state the plan provisions upon which the decision was based; failing to state what, if any, additional information or documents could perfect Plaintiff's claim; failing to state why such documents or information were necessary; and failing to state Plaintiff's right to file suit under ERISA.   Defendants have admitted that the termination letter does not state the factual information, Plan provisions, or ERISA provisions upon which the decision was based.  Am. Compl. ¶¶ 20-23; Answer ¶¶ 20-23.  Defendants further violated ERISA and the Plan by refusing to provide copies of all documents, records, and other information relevant to his claim.[32]

Similarly, Defendants appeal denial letter of March 12, 2009 (A.R. 27-29), violated ERISA § 1133 and 29 C.F.R. § 2560.503-1(j)(1)-(3) by failing to state the specific reason for the denial[33]; failing to refer to the specific plan provisions; and failing to state Plaintiff's right to copies of relevant documents.  Defendants admit in their Answer that the letter fails to state the Plan provisions upon which their decision was based.   Am. Compl. ¶ 36; Answer ¶ 36. Likewise, Defendants' appeal denial letter of December 15, 2009 (A.R. 9-11), violated ERISA § 1133 and 29 C.F.R. § 2560.503-1(j)(1)-(3) by failing to state the real alleged reason for the denial; failing to refer to the Plan provisions Defendants relied on; and failing to state Plaintiff's

---

[32] Indeed, Defendants have still not produced several documents "relevant" to Plaintiff's claim, including the Collective Bargaining Agreement.  According to Defendants' own "Appeal" document, Defendants based their decision to terminate benefits on an alleged violation of the Collective Bargaining Agreement.  A.R. 91.  However, Defendants did not disclose this information in their adverse determination letters, therefore failing to state the reason for the benefit termination; indeed, the record indicates that Plaintiff did not discover that Defendants based their decision on an alleged violation of the Collective Bargaining Agreement until after filing suit and obtaining a copy of the administrative record.

[33] For example, once again omitting any reference to the alleged violation of the Collective Bargaining Agreement.

right to obtain relevant information and documents.

Based on these multiple and ongoing violations, Defendants have prevented Plaintiff from obtaining a "reasonable opportunity" for a "full and fair review" of the termination of his benefits.  The cited violations disclose no mere series of procedural or ministerial errors; on the contrary, the record indicates that Defendants, by deliberately and repeatedly and continually ignoring and violating the claim and appeal procedures under ERISA and the Plan, are in breach of their fiduciary duties and, therefore, have never properly revoked Plaintiff's benefits.

"In cases where the administrator terminated benefits that were already granted (rather than initially denying benefits)," courts have held that "retroactive reinstatement of benefits is an appropriate remedy for procedural violations in order to return the plaintiff to the *status quo ante*."  *Smith v. Columbia Gas of Ohio Group Med. Benefit Plan*, 624 F. Supp. 2d 844, 866 (S.D. OH. 2009) (citing *Wenner v. Sun Life Assurance Co. of Canada*, 482 F.3d 878, 883-84 (6th Cir. 2007); *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629-30 (7th Cir. 2005)).  In *Wenner*, the Sixth Circuit explained that a court's

> aim in granting relief under ERISA is to place [plaintiff] "in the position he . . . would have occupied but for the defendant's wrongdoing."  To do so, reinstatement is necessary. . . .  [W]hen an initial grant of benefits has been terminated in violation of § 1133, the benefits have "*never been properly revoked*.  Thus [the] procedural violation is not the reason that [the] benefits commenced, but [it] is the reason that they should continue until a decision regarding the potential revocation of . . . benefits has been properly determined in compliance with the plan's provisions."

482 F.3d at 883 (emphasis in original) (citations omitted).  The same logic applies in this case.

Defendants approved Plaintiff's benefit claim and paid him a lump sum and monthly benefits.  A.R. 89-90, 161.  They attempted to terminate those benefits with a conclusory termination letter stating that Plaintiff had "converted" NSR's assets and "constructively

received" his pension benefits.   A.R. 89-90.   The termination letters of March 2009 and December 2009 simply re-stated the same legal conclusions.   Defendants never stated the factual information or Plan provisions relied upon in reaching their decisions.   Defendants never told Plaintiff during the administrative appeal process that they had based their decisions on an alleged violation of the Collective Bargaining Agreement.   Nor have they ever produced the Collective Bargaining Agreement to Plaintiff (or, for that matter, to this court); to this day, Defendants have not specified any particular term of the Collective Bargaining Agreement Plaintiff may have allegedly breached.[34]   Furthermore, the Electrical Workers have failed and continue to fail to provide access to Plan documents and information and documents relevant to Plaintiff's claim.[35]

---

[34] The Collective Bargaining Agreement (the "CBA") is not before the court, and statements and arguments regarding the CBA are unsupported and inadmissible in relation to Plaintiff's claim for benefits. It is somewhat surprising that Defendants would base their entire defense on the CBA, and yet not produce it to Plaintiff, or his counsel, or the court.  Even if Plaintiff's claim was not governed by ERISA, Defendants' reliance on the CBA violates the Federal Rules of Civil Procedure and this court's Scheduling Order. Summary judgment may not be supported by documents that are not in the record.  *See* Rule 56(c)(1), (2), and (3).  Furthermore, Defendants did not disclose the CBA in their October 5, 2010, Rule 26(a) Initial Disclosures, and thus are "not allowed to use that information . . . to supply evidence on a motion," including summary judgment.  Rule 37(c)(1).  Defendants rely entirely on bald allegations, and have failed to submit any evidence that NSR or Plaintiff violated the CBA or owes any fund to the Plan (or any other entity).

[35] On summary judgment, Defendants assert that specific Plan provisions support their decisions. According to Defendants, these provisions (1) authorize them to demand documents to support a claim for benefits; (2) designate the Trustees as the "sole judge of the standard of proof"; and (3) allow the Trustees to terminate benefits based on "false statements." (Citing Plan provisions at A.R. 172). These are the only Plan provisions upon which the Electrical Workers allegedly based their decision.  However, the cited provisions are completely inapplicable and do not support Defendants' decisions. Section 8.1 of the Plan (*see* A.R. 171-74, the section containing all three of the Plan provisions relied upon by Defendants) is entitled, "CLAIMS AND APPEALS PROCEDURE BEFORE JANUARY 1, 2002."  A.R. 171.  For claims and appeals after December 31, 2001 (governing Plaintiff's 2008-2010 claim and appeals), the Plan incorporated the DOL's Final Rule, as stated in 29 C.F.R. § 2560.503-1.  A.R. 174.  Unlike the Plan's prior claims and appeal procedure, 29 C.F.R. § 2560.503-1 neither authorizes the Trustees to demand documents nor designates them as the sole arbiter of the standard of proof.  Nor does it contain any provision regarding allegedly false statements.

Contrary to Defendants' assertions, the record does not indicate that Plaintiff made any inconsistent
(continued...)

Accordingly, Defendants have never properly terminated Plaintiff's benefits, and have never properly denied any administrative appeal by Plaintiff. Therefore, the appropriate remedy is for me to reinstate Plaintiff's benefits and award him all past-due benefit payments.

### D.

Plaintiff has filed two motions to strike certain affidavits and portions of Defendants' summary judgment briefing. I will deny Plaintiff's motions to strike. Although Plaintiff is correct that certain of Defendant's submissions are improperly before the court, and Plaintiff is entitled to the requested relief,[36] I have considered the entirety of Defendants' submissions, and I

---

[35](...continued)

or fraudulent statements during the administration of his claim. Plaintiff and his counsel stated that (1) NSR went out of business "largely because" of Rust's health problems, *see* A.R. 41; and (2) that the Bank's seizure and mismanagement of NSR "contributed to the demise of NSR," *see* A.R. 60. The record provides no support for Defendants' assertion that these statements are inconsistent, mutually exclusive, or fraudulent. *More importantly, Defendants could not have "relied upon" these statements when they decided to terminate Plaintiff's benefits, given that the statements were made **after** the benefits were terminated.*

Defendants asserted rationale for the termination thus fails. To date, Defendants have failed to state – in their termination letter, the appeal denial letters, or in their motion for summary judgment – any provisions in the Plan authorizing their decision to offset NSR's alleged debts against Plaintiff's vested pension benefits.

[36] Defendants's submissions do not provide substantial evidence to support the decision to terminate and rescind Plaintiff's vested pension benefits.

In support of their opposition to Plaintiff's motion for summary judgment, Defendants attached and rely upon the affidavits of Peter Klein (identified in Defendants' initial disclosures as an employee of the "Fund Office") and Eric J. Wexler, Esq. (Defendants' representative and counsel in the instant action and at all times relevant to the matters raised in this action). These affidavits violate Rules 26(a)(1) and 37(c)(1) of the Federal Rules of Civil Procedure. The affidavits exceed the information and individuals identified in Defendants' initial disclosures, which stated that Mr. Klein's knowledge was limited to information regarding "benefits already received by" Plaintiff and "the administrative determination and multiple appeals," and did not at all identify Mr. Wexler as an individual likely to have discoverable information. Both affidavits constitute improper attempts to supplement the administrative record and to introduce hearsay, and Mr. Wexler's affidavit is rife with statements that the record clearly indicates are inaccurate.

When Defendants replied to Plaintiff's opposition to Defendants' motion for summary judgment, they submitted the affidavit of Julie Linkins, who states that she is "employed at the . . . Trust Fund Office." Linkins was identified in Defendants' initial disclosures, but her affidavit, like the Klein and Wexler affidavits, exceeds the information disclosed by Defendants in their initial disclosures pursuant to Rule 26(a)(1) and, therefore, must be stricken pursuant to Rule 37(c)(1). The Linkins affidavit improperly recites alleged documents that were not timely disclosed by Defendants; constitutes an improper attempt to

(continued...)

find Defendants' arguments wholly unpersuasive.

## IV. CONCLUSION

For the heretofore stated reasons, I will deny Defendants' motion for summary judgment, I will grant Plaintiff's motion for summary judgment, and I will deny Plaintiff's motions to strike.

An appropriate order accompanies this memorandum opinion.

Entered this ____29th____ day of September, 2011.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[36](...continued)
supplement the administrative record; and includes inadmissible hearsay and hearsay within hearsay.